

09 CV 8575

CARABBA LOCKE LLP
100 William Street
New York, New York 10038
(212) 430-6400
By:   Anthony Carabba, Jr. (AC 1487)
      Jessica Vulpis (JV 0190)

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| KRISTY GRAY, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| -against- | ) |
|  | ) |
| REGENERON PHARMACEUTICALS, INC., | ) |
| MICHAEL KAPLAN, and RICHARD A. | ) |
| MONTANARO, | ) |
|  | ) |
| Defendants. | ) |

Civ No.:

**COMPLAINT AND
JURY DEMAND**

RECEIVED
OCT – 8 2009
U.S.D.C. S.D.N.Y.
CASHIERS

       Plaintiff Kristy Gray, by and through her attorneys Carabba Locke LLP, as and

for her Complaint against the above-captioned defendants, alleges as follows:

## NATURE OF CLAIM

       1.     Plaintiff brings this lawsuit against her former employer Regeneron

Pharmaceuticals, Inc. ("Regeneron") and two of its managers, Michael Kaplan and

Richard A. Montanaro (collectively "Defendants") pursuant to Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the New

York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* (the "Human Rights Law") for workplace sexual harassment and discrimination based on her gender, aiding and abetting discrimination and harassment, and retaliation for opposing discrimination and asserting rights under Title VII and the Human Rights Law.

2.     Plaintiff seeks compensatory and punitive damages, emotional distress damages, attorneys' fees, and other appropriate relief under Title VII and the Human Rights Law.

## THE PARTIES

3.     Plaintiff, who was 23 years old during her employment at Regeneron, resides in New Haven County, Connecticut and is a citizen of the United States.

4.     Upon information and belief, Defendant Regeneron is a biopharmaceuticals company that specializes in the development and commercialization of certain medicines and is located at 777 Old Saw Mill River Road, Tarrytown, New York 10591.

5.     Upon information and belief, Regeneron employs more than 15 individuals.

6.     Upon information and belief, Defendant Michael Kaplan ("Kaplan") is employed at Regeneron as an Associate Director of the Facilities Department.

7.     Upon information and belief Kaplan is resident of New York and is a citizen of the United States.

8.      Upon information and belief Defendant Richard A. Montanaro ("Montanaro") is employed at Regeneron as the Associate Director of Training and Organization Development.

9.      Upon information and belief Montanaro is a resident of Connecticut and is a citizen of the United States.

10.     Regeneron is an "employer" within the meaning of Title VII, Section 701, 42 U.S.C. Section 2000e-(b), and within the meaning of Human Rights Law, Section 292(5).

## JURISDICTION AND VENUE

11.     This court has jurisdiction over this action pursuant to 42 U.S.C. § 2000e-5 and 28 U.S.C. §§ 1331, 1343. This court may assert supplemental jurisdiction over the state law claims as authorized by 28 U.S.C. § 1367 (a).

10.     Venue properly lies within this judicial district as Regeneron's office is within this judicial district and because the unlawful employment practices alleged herein occurred in this judicial district.

11.     Plaintiff has fulfilled the administrative prerequisites prior to filing suit.

## STATEMENT OF FACTS

12.     Plaintiff was employed as an Administrative Assistant at Regeneron from on or about February 4, 2008 until she was terminated on November 6, 2008 in direct response to, and in retaliation for, her frequent complaints about the constant sexual harassment and discrimination she was forced to endure.

13.     From February 4, 2008 through mid-September 2008, Plaintiff's direct supervisor was Defendant Kaplan. Upon information and belief, Plaintiff was Kaplan's first personal Administrative Assistant at Regeneron. From mid-September until her termination, her direct supervisor was Joanne Deyo ("Deyo"), a Vice President of the Facilities department.

*Plaintiff Is Subjected To Discriminatory Conduct by Her Supervisor*

14.     From the beginning of her employment, Kaplan subjected Plaintiff to severe and pervasive acts of sexual harassment.  When she first began working for Kaplan, he regularly kept her late at the office to assist him on various assignments. All of these assignments could have been completed during normal business hours. Plaintiff soon realized that he kept her late because he was "interested" in her.

15.     Often they were the only two in the office during these late nights.

16.     During the nights Plaintiff worked late with Kaplan, he would sit uncomfortably close to Plaintiff, share personal information about himself and his family, and make suggestive, sexually-based remarks.

17.     For example, on or about February 13, 2008 Plaintiff worked until 7:00 p.m. with Kaplan to enter scheduled facilities requests. Kaplan pulled up a chair and sat very close to Plaintiff, just two to three inches away, as she worked on her computer.

18.     While Plaintiff worked, Kaplan repeatedly told her that he was "happy" he had hired her.

4

19.    He also told her they had a "connection" and said, "You know when two people meet and they instantly know that there is something special, like a connection?"

20.    Kaplan also spoke at length about his personal life (and asked Plaintiff questions about her own family) and his alcoholic mother.

21.    Kaplan's close proximity to Plaintiff, along with his remarks about their "connection," which Plaintiff believed were clearly sexual in nature, made her feel extremely uncomfortable.

22.    On or about February 20, 2008, Plaintiff worked with Kaplan until 8:30 p.m. per his instruction. Once again, Kaplan sat uncomfortably close to her (leaving almost no space between them).

23.    Kaplan asked Plaintiff if she would go out with him. He made it very clear that no other Regeneron employees were invited and that it would be a "date." Plaintiff declined the invitation.

24.    Kaplan then began to talk to Plaintiff about his ex-wife and how, after they broke up, she used to stalk him by showing up at his job unannounced and buying him gifts. He tried to ask Plaintiff questions about her personal life but she quickly changed the subject and focused on getting the work done so she could leave.

25.    Approximately two days later, on or about February 22, there was a snow storm. Plaintiff called Kaplan to let him know that she did not want to risk driving to work in such inclement weather.

26.     Kaplan called Plaintiff back on her cellular phone to tell her that he wanted her to come in because he was the only person (besides a few engineers) in the office. He told Plaintiff that he was "lonely."

27.     Kaplan said he would go to Plaintiff's house and pick her up to take her to work. She said no because she did not want him at her house for any reason.

28.     Upon information and belief, Kaplan did not offer to pick up any other Regeneron employees from their homes to bring to work that day.

29.     Thereafter, on or about February 28, Kaplan again required Plaintiff to work late with him.

30.     As always, Kaplan sat very close to her at her desk while she worked. He told her stories about his alcoholic mother and said that he frowns upon people who drink.

31.     Kaplan was aware that Plaintiff sometimes worked nights at a bar to supplement her income and he asked if she drinks alcohol. He also asked how the male customers at the bar "treated her." Plaintiff responded that they treated her fine and changed the subject.

32.     Kaplan replied that he "wished" Plaintiff "didn't have to go through with that," even though she had told him the male customers did not bother her and she worked that job to help pay her bills. Then Kaplan said, "Well, I wish there was a way I could buy you a house in White Plains."

33.     Those comments made Plaintiff feel extremely uncomfortable and she immediately told Kaplan that they needed to finish their work because she could not

stay any later that night. Kaplan responded, "You see how we are getting close to each other while working and we are using work as a barrier to not get too close. Why is that? What would it be like outside of work?"

34.     Plaintiff was very upset at those remarks and after that night she refused to work late nights with Kaplan.

35.     In or about March 2008, Kaplan called Plaintiff into a meeting to discuss why they had stopped "communicating" and that they needed to "communicate to make this work." This meeting was in response to Plaintiff's decision to stop working late nights with him after his prior advances. Kaplan was clearly angry that Plaintiff refused to succumb to his sexual advances.

36.     During this time, Plaintiff was also being groomed for a project manager position. Kaplan had repeatedly assured her that she would get the position. However, after she had rejected Kaplan's advances, Kaplan hired a new employee for the position.

37.     Some of Plaintiff's coworkers had begun calling her "Pebbles," in reference to the Flintstones cartoon character that had red hair worn in a ponytail. Plaintiff often wore her red hair in a ponytail, hence the nickname.

38.     Plaintiff did not consider the nickname offensive until Kaplan overheard Mike Tramaglini ("Tramaglini"), a Regeneron employee, call Plaintiff Pebbles. Annoyed no one was talking to him, Kaplan then asked if Tramaglini was Plaintiff's "Bam Bam"—Pebbles' "boyfriend" in the cartoon.

39.     Thereafter, any time Kaplan saw Plaintiff talking to Tramaglini, he would make inappropriate comments that Tramaglini was Plaintiff's Bam Bam.

40.     This was offensive and disturbing to Plaintiff because it was obvious that Kaplan was trying to fish around to see if Plaintiff was dating Tramaglini, if she was interested in him, or if she was single.

41.     Even more upsetting to Plaintiff was that Kaplan began to refer to himself as "Fred Flintstone," who is Pebbles' father in the cartoon, and make disturbing comments about being Plaintiff's father.

42.     Kaplan would say to Plaintiff, "If you are Pebbles, then I am Fred and that makes me your father" and "I got you breakfast because you are my daughter."

43.     Kaplan called Plaintiff's coworker, Anissa Graham ("Graham") "Wilma Flintstone," Fred's wife in the cartoon, and Kaplan would comment, "Well, Anissa, don't we have to take care of our daughter?"

44.     Plaintiff felt disgusted that Kaplan would reference being her "father" and needed to "take care of her."

45.     On or about March 7, 2008, Kaplan sent Plaintiff an email regarding a new calendar that was being created on the computer. Kaplan wrote, "I was thinking of calling it "pebbles place" but I figured I'd better ask you first!!!"

46.     Kaplan also frequently asked Plaintiff out to lunch. He told Plaintiff he wanted to let her know how happy he was that she was working for him. Plaintiff repeatedly told him no. Nevertheless Kaplan constantly asked her if she was free for lunch the next day on the nights he forced her to work late with him.

47.     Moreover, Kaplan was jealous of any time that Plaintiff spent with her coworkers. If a coworker came by her desk to talk to her he would immediately rush over to interrupt or stand very close to Plaintiff for extended periods of time. Kaplan constantly hovered around Plaintiff.

48.     Plaintiff's coworkers noticed this behavior and commented that Kaplan "has something for you" and "he's obsessed."

49.     Plaintiff frequently caught Kaplan staring at her breasts and butt. His constant staring made her feel embarrassed and self-conscious.

50.     Additionally, Plaintiff noticed that some of the new hires in the Facilities Department, as well as most of the other employees within the department, were granted half-day Fridays. Plaintiff inquired if she would be permitted those days too and Kaplan told her no because Deyo would not approve.

51.     Soon thereafter, Graham (whose position as Coordinator was similar to Plaintiff's) was given half-day Fridays and Plaintiff again asked Kaplan why she could not have them. Kaplan became angry with Plaintiff and told her that Deyo would not allow it and that he needed her to stay until 5:00 p.m. on Fridays.

52.     One subsequent Friday, Deyo saw Plaintiff working and asked why she was staying late when the other employees had left early. Plaintiff explained that Kaplan told her he needed her there. Deyo responded, "Mike, you're so mean." Confused, Plaintiff asked Deyo about the policy regarding half-day Fridays and was told it is "up to your supervisor."

53.     Plaintiff confronted Kaplan with Deyo's answer and he responded that Deyo was "lying" and only said that to "get back at him." It was evident that Kaplan lied when he told Plaintiff that Deyo would not permit her half-days and that this was in retaliation for her rejecting his constant advances.

54.     On or about September 4, 2008, around mid-afternoon, Plaintiff was at her desk discussing a work project with her coworkers Tom Corcoran ("Corcoran") and Tramaglini. Corcoran asked Plaintiff to put in a request to move and clean out some boxes.

55.     Kaplan overheard their discussion and asked Plaintiff, in front of Corcoran and Tramglini, "Kristy, you're cleaning out your *box?*" There was no mistaking the sexually suggestive meaning behind that remark.

56.     Kaplan asked Plaintiff again, "You're cleaning out your *box*?" Plaintiff was so shocked that she could say nothing and Corcoran, who understood the reference, walked away shaking his head in disgust.

57.     Tramaglini, who also understood the reference, looked at Kaplan and said, "where do you go with that?" and walked away in disgust.

58.     Later that same day, at approximately 4:45 p.m., Kaplan called Plaintiff into a meeting with him and Nicole Pizzuto ("Pizzuto"), a Human Resources employee.

59.     The meeting was to discuss an incident that happened the previous weekend. Plaintiff had emailed Kaplan on the Monday of Memorial Day weekend to inform him that she was going to work that day to finish a project that was due that week.

60.     Kaplan's response to Plaintiff's email was to ask, "Will you be by yourself?"

61.     When Plaintiff responded that Tramaglini would be available to help her with the project (which involved moving 300 old computers), Kaplan wrote back, "I don't think it's a good idea."

62.     Kaplan explained that if Plaintiff did not finish the project, it would look like she "went in and just hung out with Mike [Tramaglini]" and that he did not want to "explain why I authorized two people to come in on a holiday and hang out."

63.     Upset with Kaplan's insinuation, Plaintiff informed Tramaglini of Kaplan's comments. Tramaglini was also upset with the inappropriate insinuation and sent an email to Kaplan, Plaintiff and Jerry LaBadia (Tramaglini's supervisor) stating, "I cleared myself coming in today with Jerry on Friday...I brought up the idea to Kristy to come in so we can finish this project today b/c nobody would be in and we would not have any distractions. We have been getting practical [sic] no help from IT, and Kristy and I had to make arrangements with Shipping to get the truck when they were not using it to go back and forth and pick up all the computers are selves [sic]. Also, to consider Kristy and I would handing out at work, I can think of a lot of better things to do on a day off then to hang out at work. Just thinking like that comes to me as you thinking Kristy and I have just been hanging out in the storage building all last week doing nothing."

64.     It was obvious from Kaplan's emails that the idea of Plaintiff possibly spending time with Tramaglini upset Kaplan. Plaintiff knew that Kaplan's remark that

she was going in to work to just "hang out" with Tramaglini was just another effort on Kaplan's part to keep her male coworkers away from her. She also felt disgusted by Kaplan's obvious jealousy and oddly possessive behavior.

65.    The subsequent meeting with Kaplan and Pizzuto regarding these emails made Plaintiff extremely uncomfortable because Pizzuto not only had a very close relationship with Kaplan (they often went to lunch together), she was also not the proper Human Resources employee to mediate employee relations. Indeed, Pizzuto did coordination work for Human Resources.

66.    It was clear to Plaintiff that Pizzuto was uncomfortable throughout the meeting as she said very little and looked confused as to why Kaplan had asked her to be there.

67.    During the meeting Kaplan's attitude was hostile and he repeatedly said that the "relationship" between him and Plaintiff "isn't working."

68.    Upset with Kaplan's "box/vagina" comment and the meeting with Pizzuto, Plaintiff complained the following day, on or about September 5, to Stuart Kolinsky ("Kolinsky"), Senior Vice President and General Counsel, about the "box/vagina" comment. Kolinsky directed Plaintiff to Montanaro.

69.    Thereafter, Plaintiff complained to Montanaro about the "vagina" comment, that it was sexual in nature, and that Tramaglini and Corcoran heard it as well. She also detailed for him all of the sexual harassment and retaliation she suffered.

70.    She also explained that the September 4 meeting with Pizzuto and Kaplan was in retaliation for her rejecting Kaplan's advances.

71.     Montanaro admitted to Plaintiff that after the September 4 meeting Pizzuto had complained to him that she did not understand why she was requested to be at the meeting and that she too had felt completely uncomfortable with the meeting.

72.     Montanaro told Plaintiff he would look into her complaints. Thereafter, in or about the week of September 8, 2008, Montanaro informed Plaintiff that the results of the investigation were "inconclusive" despite that Tramaglini confirmed that Kaplan made the box/vagina comment.

73.     Nevertheless, Montanaro concluded that the situation was of the "he said/she said" variety.

74.     Plaintiff again complained that Kaplan was making sexual advances towards her and that she felt extremely uncomfortable around him. She requested that she be transferred out of his department.

75.     Montanaro responded that while they would not transfer her from the department, she would be reassigned to work under Deyo, starting on or about September 15.

76.     At the time that Plaintiff complained to Montanaro about the sexual harassment, she also informed him that she had taken notes contemporaneously with each incident of harassment. The notes set forth in specific detail the dates of the harassment, exactly what Kaplan had said or done, and how his behavior made her feel.

77.     Plaintiff had begun taking the notes after she complained to Graham that Kaplan's comments were harassing and making her very uncomfortable. Graham told

13

Plaintiff that she had suffered sexual harassment and discrimination at her previous employer and that Plaintiff should take notes recording Kaplan's behavior.

78.    When Plaintiff provided the notes to Montanaro, his only comment was "oh, so you really did write that stuff down"—as if Plaintiff had been lying. Plaintiff knew then that Montanaro would do nothing to help her.

79.    On or about September 11, 2008, Kaplan approached Plaintiff and demanded to know where she had been. Plaintiff responded that she did not feel comfortable speaking with him and that, as of that day, she reported to Deyo.

80.    Kaplan became very angry and replied, "Not until Monday, where were you!" Plaintiff told Kaplan twice that he was making her very uncomfortable and had to ask him to leave her desk area.

### Defendants Retaliate Against Plaintiff In Direct Response To Her Complaints

81.    Despite that Plaintiff was under Deyo's supervision, Plaintiff was still forced to endure Kaplan's constant scrutiny because their desks were in very close proximity to each other, which meant that Plaintiff had to interact with him on a daily basis. (That's why Plaintiff asked to be transferred to a different department.)

82.    Kaplan would often spend inordinate amounts of time by the copy machine that was located next to her desk, staring at her, continuing to look at her breasts and butt which made her uncomfortable.

83.    On or about September 24, 2008, Kaplan sent Plaintiff four emails regarding an unpaid invoice for a computer recycling project. Plaintiff told Kaplan repeatedly, via email, that the invoice was not her responsibility since she did not work

on the project but, in any event, she had left the invoice (and other relevant documents) on his desk. She also attached to her email the invoice and the other relevant documents and explained that the invoice was not past due and there was no late fee on the bill.

84.    Even after Plaintiff emailed the documents to Kaplan, he persisted in sending her several emails about the invoice.

85.    Upset, Plaintiff wrote that she felt the email exchange was "ridiculous." Kaplan responded, "I didn't start the ridiculousness"—as if Plaintiff had done something wrong by complaining about his sexually harassing conduct.

86.    Plaintiff responded, "There is no reason for this harassment." It was evident that Kaplan wanted to provoke Plaintiff by sending her unnecessary, hostile emails.

87.    Remarkably, Deyo, who was carbon copied on all of the emails, did nothing to stop Kaplan from sending Plaintiff the hostile emails. Plaintiff approached Deyo to complain about Kaplan's conduct and Deyo responded that Plaintiff should have informed her about the emails.

88.    Plaintiff explained that Deyo had been carbon copied on the emails. Deyo's only response was to say, "I don't read all of my emails."

89.    Deyo then informed Plaintiff that she was being "overly sensitive" and that she "needed to do some soul searching" because she noticed that Plaintiff's body language changed at the mention of Kaplan's name. She also said that Plaintiff needed to, "think about how [you're] going to make this better" and "think about your future career here." In other words, Deyo was warning Plaintiff to stop complaining.

90.     Incredibly, Deyo also told Plaintiff that she did not believe Plaintiff's complaints of harassment, stating "Mike would not do that."

91.     It was clear that Deyo did not intend to help prevent Kaplan's retaliatory conduct. In fact, she suggested that Plaintiff just go along with whatever Kaplan did to her.

92.     In addition to having to still interact with Kaplan on a daily basis, under Deyo's supervision Plaintiff was not permitted to work the same overtime she worked while under Kaplan. This greatly reduced Plaintiff's pay.

93.     Plaintiff continued to complain to Montanaro that she felt uncomfortable working in Kaplan's department in very close proximity to him and she again requested to be switched to a different department. She was told this would be impossible because there were no available positions to move her to.

94.     Tellingly, Montanaro also told Plaintiff that Kaplan "feels like the victim here" and that because "it's either side of the coin, Kaplan could be seen as the victim because his job is being compromised."

95.     Thereafter, Kaplan turned to another form of retaliation--he attempted to turn Plaintiff's coworkers against her and ostracize her from the group.

96.     On or about October 30, Plaintiff's coworkers Mike DeGhetto and Bobby Hoyt told her that Kaplan was complaining about her to them and other employees regarding an issue with a microwave that needed to be repaired.

97.     Kaplan said that "Kristy shouldn't have been in charge of this, she messes up everything."

98.    Plaintiff had nothing to do with the microwave issue, in fact, she had correctly delegated the repair request which was then assigned to Kaplan.

99.    Plaintiff immediately complained to Montanaro that Kaplan was again retaliating against her. Shockingly, Montanaro's response was that the Company needed to look into some "exit" options for her.

100.    Then, on or about November 4, Plaintiff received her first written Performance Evaluation—prior to this written evaluation, her other evaluations (two or three in total) were given to her orally by Kaplan. All of the oral evaluations occurred before her complaints of harassment and in those reviews she was told that she was doing an "outstanding" job and going "above and beyond" in her work duties.

101.    In the written review, however, Deyo gave Plaintiff a total score of "Key Contributor Minus" with a "Meets Minimum Expectations" score in 23 categories—the first poor evaluation she had ever received. The evaluations were rated on a scale (in descending order) of: Distinguished, Excellent Performer, Key Contributor, Meets Minimum Expectations, and Needs Improvement.

102.    Moreover, some of Deyo's criticisms were outright false, such as her comments that Plaintiff lacks basic math skills, her writing skills are basic, and her verbal communications tend to be "quite abrupt."

103.    Deyo also wrote that, "much of the content on this evaluation was developed with input from her previous supervisor." In other words, in a blatant act of retaliation, Plaintiff's below-par rating was derived from information given by Kaplan. Deyo went on to write that, "due to the needs of the business we may need to further

redesign her role to return some of the tasks that may require interaction with her previous supervisor and his engineering group."

104.   In yet another act of retaliation, that same day Plaintiff was given a release to sign confirming her separation of employment. Montanaro informed her that her position was being eliminated because there was not enough work for her and he tried to force her to sign the release.

105.   Plaintiff was told the only way she could continue her employment would be to agree to work with Kaplan again and that she had until November 7 to decide.

106.   Plaintiff was shocked that she was being punished for her complaints of Kaplan's sexually harassing conduct. Instead of terminating the harasser, the Company's solution was to terminate her

### Plaintiff is Terminated in Direct Retaliation For Her Complaints Against Kaplan

107.   Feeling like she had no other alternative because she needed the employment, Plaintiff went to work as usual on November 5 and 6.

108.   On November 6 she informed Montanaro that she decided to choose the option of working for Kaplan. Plaintiff did this because, even though she was being sexually harassed and retaliated against, she desperately needed the job.

109.   Unbelievably, Montanaro responded that he had never suggested this option to Kaplan and that Deyo did not think Plaintiff's continued employment would work out due to her poor performance review. Montanaro added that "everyone is at their wits end here."

110.    Montanaro also stated that Kaplan was swamped with work because no one had taken over the work Plaintiff was previously doing. Again, Plaintiff said that she would like to find a way to work for Kaplan and resume her old responsibilities, which would solve the problem of the excess work that was not being done. Montanaro responded that he had not anticipated that she would choose the option of working with Kaplan and that (in sum or stubstance) "I think what we have to offer you is the best solution and we have exhausted and stressed the situation enough, I think you should take the severance offer. Joanne had agreed to announce to the department that you have resigned due to the new position not working out."

111.    Unsatisfied with this response, Plaintiff again said she would work with Kaplan rather than signing the release. Montanaro disagreed and stated, "You should just take what we have generously offered you and just leave."

112.    Since he was not letting Plaintiff remain employed, she replied, "So I should just go upstairs, get my things and leave?" and Montanaro directed, "Yes."

113.    Terminated, Plaintiff promptly went to her desk, collected her personal items and left her Company-provided cellular phone, keys, work badge and Regeneron sweater on her desk. She took her personal effects including a fish bowl that she kept on her desk.

## FIRST CAUSE OF ACTION

### Hostile Work Environment Sexual Harassment; Sexual Discrimination

114.    Plaintiff realleges and incorporates by reference paragraphs 1 through 113 of the Complaint as if fully alleged herein.

115.   By the aforementioned actions, Defendants, separately and together, have subjected Plaintiff to a continuing hostile and abusive work environment, permeated with sexual harassment, in violation of Title VII and the Human Rights Law and have discriminated against her on the basis of gender.

116.   As a result of the harassment and discrimination engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, constructive termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation and damage to reputation and career.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Sex Discrimination and Sexual Harassment

117.   Plaintiff realleges and incorporate by reference paragraphs 1 through 116 of the Complaint as if fully set forth herein.

118.   By the aforementioned actions, Defendants, separately and together, have aided and abetted gender discrimination and sexual harassment, in violation of Title VII and the Human Rights Law.

119.   As a result of the aiding and abetting engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, constructive termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation and damage to reputation and career.

## THIRD CAUSE OF ACTION

**Retaliation**

120.    Plaintiff realleges and incorporate by reference paragraphs 1 through 119 of the Complaint as if fully set forth herein.

121.    Defendants, separately and together, have discriminated against Plaintiff in retaliation for, and on account of, her opposing discrimination and asserting her rights under the anti-discrimination laws with respect to compensation, terms, conditions and privileges of employment in violation of Title VII and the Human Rights Law.

122.    As a result of Defendants' retaliation against her, Plaintiff has suffered severe damage, including deprivation of income and benefits, constructive termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation and damage to reputation and career.

## FOURTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

123.    Plaintiff realleges and incorporates by reference paragraphs 1 through 122 of the Complaint as if fully alleged herein.

124.    By Defendants' extreme and outrageous conduct, Defendants, separately and together, intended to cause and did cause severe emotional distress to Plaintiff.

125.    Plaintiff has suffered, and continues to suffer, severe emotional harm, loss, injury, and damage as a result of Defendants' conduct.

**WHEREFORE**, Plaintiff demands that judgment be entered in her favor and that the Court order and award Plaintiff the following relief against Defendants:

A.     Damages in the form of (i) back pay with interest based on Plaintiff's appropriate compensation had she not been discriminated against; and (ii) front pay.

B.     Compensatory damages for her emotional pain and suffering, mental anguish, distress, humiliation, and loss of reputation in an amount not less than $5,000,000;

C.     Punitive damages in an amount not less than $5,000,000;

D.     Attorneys' fees;

E.     Costs and disbursements;

F.     Interest; and

G.     Such other and further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury as to all issues in the above matter.

Dated: New York, New York
        October 8, 2009

                              Respectfully submitted,

                              CARABBA LOCKE LLP

                              By: _____
                              Anthony Carabba, Jr. (AC 1487)
                              Jessica Vulpis (JV 0190)

                              100 William Street
                              New York, New York 10038
                              212-430-6400

                              *Attorneys for Plaintiff*